UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

EDWARD R. BLAKE, et al.,

                Plaintiffs,

    v.                                      **DECISION AND ORDER**
                                              10-CV-610S

UNITED STATES OF AMERICA, et al.,

                Defendants.

## I.    INTRODUCTION

Edward R. Blake and Roxanne R. Blake (together, "Plaintiffs") commenced this action pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346 and 2671 *et seq.* ("FTCA") and state law, seeking damages from the United States (the "Government"), NYSARC INC. Chautauqua County d/b/a The Resource Center (the "Resource Center"), and Dr. Nabil Jamal (together, "Defendants") for an injury sustained by Mr. Blake while in the care of medical professionals working for a clinic and hospital administered by the Department of Veterans Affairs ("VA").

Specifically, Plaintiffs allege that Defendants and their agents committed medical malpractice by failing to timely diagnose and treat Mr. Blake's cauda equina syndrome ("CES") during medical visits between June 29, 2006 and July 2, 2006. Mrs. Blake also makes a claim against Defendants for loss of consortium. The case was tried before this court over 17 days between September 6 and November 3, 2016. The Government has moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. Plaintiffs, as well as Defendants Dr. Jamal and the Resource Center, have moved for judgment on partial findings under Rule 52 of the Federal Rules of Civil

Procedure.  Having considered the evidence admitted at trial, assessed the credibility of the witnesses, and reviewed the post-trial submissions of the parties, this Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure[1] ("Rule 52") and ultimately concludes, for the reasons set forth below, that Plaintiffs have failed to prove that Defendants are liable for Mr. Blake's injuries.

## II.    LEGAL STANDARD

Under the FTCA, the United States is liable in the same manner as a private person for the tortious acts or omissions of its employees acting within the scope of their employment "in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1); see also Molzof v. United States, 502 U.S. 301, 305, 112 S. Ct. 711, 116 L. Ed. 2d 731 (1992) ("the extent of the United States' liability under the FTCA is generally determined by reference to state law") (citations omitted). Accordingly, a federal court presiding over an FTCA claim must apply "the whole law of the State where the act or omission occurred."  Richards v. United States, 369 U.S. 1, 11, 82 S. Ct. 585, 7 L. Ed. 2d 492 (1962); see also Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994) ("State law applies to an FTCA claim.").  Because state law applies to the United States in an FTCA claim in the same manner it would apply to a private person, the Government, Dr. Jamal, and the Resource Center are all held to the same standard of care.  See 28 U.S.C. § 1346(b) (1).

To establish a medical malpractice claim under New York law, a plaintiff must prove by a preponderance of the evidence:  "(1) the standard of care in the locality

_____

[1] Rule 52 provides, in relevant part, that following a bench trial, "the court must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52.

where the treatment occurred; (2) that the defendant breached that standard of care; and (3) that the breach of the standard was the proximate cause of injury." See, e.g., Berger v. Becker, 272 A.D.2d 565, 565, 709 N.Y.S.2d 418 (2d Dep't 2000). Under the first element, the general standard of care in New York requires a physician to exercise "that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices. . . . The law holds [the physician] liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment." United States v. Perez, 85 F. Supp. 2d 220, 226 (S.D.N.Y. 1999) (quoting Pike v. Honsinger, 155 N.Y. 201, 49 N.E. 760 (N.Y. 1898)); see also Sitts v. United States, 811 F.2d 736, 739-40 (2d Cir. 1987). An error in medical judgment by itself does not give rise to liability for malpractice. Nestorowich v. Ricotta, 97 N.Y.2d 393, 398, 740 N.Y.S.2d 668, 767 N.E.2d 125 (N.Y. 2002). Consequently, in order to prevail, Plaintiffs must have shown by the preponderance of the evidence that the medical professionals treating Mr. Blake failed to conform to accepted community standards of practice. Id. at 398. The "mere fact that a medical procedure was unsuccessful, or had an unfortunate effect, will not support a claim that negligence had occurred." Perez, at 227. And not "every instance of failed treatment or diagnosis may be attributed to a doctor's failure to exercise due care." Nestorowich, 97 N.Y.2d at 398.

To establish a fact by a preponderance of the evidence, a plaintiff must "prove that the fact is more likely true than not true." See Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997) (quotation and citation omitted). Each element must be established by expert medical opinion unless the deviation from a proper standard of care is so obvious

as to be within the understanding of an ordinary layperson. <u>See, e.g.</u>, <u>Sitts</u>, 811 F.2d at 739-40 (noting that "in the view of the New York courts, the medical malpractice case in which no expert medical testimony is required is 'rare'") (citation omitted); <u>see also</u> <u>Fiore v. Galang</u>, 64 N.Y.2d 999, 1000-01, 489 N.Y.S.2d 47, 478 N.E.2d 188 (N.Y. 1985) ("except as to matters within the ordinary experience and knowledge of laymen, in a medical malpractice action, expert medical opinion evidence is required to demonstrate merit").

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW[2]

#### A. Background

Eleven fact witnesses testified at trial. Both Mr. and Mrs. Blake, as well as several of their family members, testified as to the relevant events and as to Mr. Blake's current condition. The fact witnesses also included several of the medical professionals who treated Mr. Blake during the relevant period: Dr. Jamal, who treated Mr. Blake on June 29, 2006 at the VA Clinic in Dunkirk, NY, operated by the Resource Center; Dr. Rabie Stephan, who treated Mr. Blake on June 30, 2006 at the Buffalo VA Hospital; Nurse Cheryl Kline, who took Mr. Blake's telephone triage call to the Buffalo VA Hospital on July 1, 2006; and Drs. Edward O'Brien and Geoffrey Hobika, who treated Mr. Blake on July 1 and 2, 2006 at the Buffalo VA Hospital. In addition, numerous exhibits were entered into evidence, consisting primarily of Mr. Blake's medical records.

---

[2] This Court describes only those issues that are material to the resolution of the parties' claims. <u>See</u> <u>Immigration & Naturalization Serv. v. Bagamasbad</u>, 429 U.S. 24, 25, 97 S. Ct. 200, 201, 50 L. Ed. 2d 190 (1976) ("courts . . . are not required to make findings on issues the decision of which is unnecessary to the results they reach"); Rule 52 Advisory Committee Notes (1946 Amendment) ("the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts").

1. CES

CES is a rare syndrome described as "a collection of signs and symptoms associated with compression of the cauda equina." (Tr. 783.)[3] Cauda equina is Latin for "horse's tail," and refers to the collection of nerve roots in the lower spinal canal. (Id.) As noted in a prior case in this district addressing malpractice and CES:

> CES is a rapidly-evolving neurologic disorder related to spinal cord and spinal cord leash compression which causes a very specific constellation of symptoms, which are necessary in order to make the diagnosis. These symptoms are: (1) saddle anesthesia (*i.e.*, no sensation in the legs, anus or accompanying regions), (2) rapidly progressing neurologic weakness progressing to paralysis and (3) bladder dysfunction. Indeed, . . . bladder dysfunction is the "hallmark" symptom of CES.

Jimerson v. United States, No. 99-CV-0954E(SR), 2003 WL 251950, at *2 (W.D.N.Y. Jan. 13, 2003) (internal punctuation and citations to the record omitted). Based on the credible expert testimony, this Court finds these three symptoms—bladder dysfunction, saddle anesthesia, and loss of the ability to walk—to be "red flag" symptoms of CES.

2. Mr. Blake's Prior Injury

Mr. Blake first hurt his lower back in 1972 while serving in the Navy, and had several other injuries through the years, which resulted in his retirement in 1993 at the age of 44. (Tr. 984-85.) He experienced chronic lower back pain from the 1980s through the time of the incident at issue here in 2006, including times where the pain was in remission and other times when his pain worsened. (Tr. 2065, 2466.) During that period, Mr. Blake took narcotic pain relievers and used prescription drugs as sleep aids due to the severity of his back pain. (Tr. 2469.) In addition to a long history of back pain, Mr. Blake also experienced difficulty walking at times. (Tr. 2469, 987-88.) There were also multiple instances prior to 2006 where Mr. Blake reported pain that

---

[3] Citations to the bench trial transcript are designated "Tr."

radiated from his back into his buttocks, hips, or legs, as well as numbness in his lower extremities.  (Tr. 2467.)

### 3.  June 24, 2006 through July 2, 2006

The events at issue began on the weekend of June 24 and 25, 2006 when Mr. Blake experienced increased pain after painting patio furniture.  (Tr. 727.)  At the time, he did not think that the injury was any kind of emergency:  "I thought . . . it was going to hurt for a couple of days and go away."  (Tr. 1481.)  On Monday, June 26, 2006, Mrs. Blake called the VA Clinic in Dunkirk, NY, operated by the Resource Center, and was given an appointment for Mr. Blake with Dr. Jamal on Thursday, June 29, 2006.  (Tr. 1482.)  Neither Mr. nor Mrs. Blake sought an earlier appointment or went to the emergency room because they did not consider the pain to be an emergency at that time.  (Tr. 979-81, 1401-02.)

Mr. Blake and Mrs. Blake testified that, on the evening of Wednesday, June 28, 2006, Mr. Blake experienced difficulty urinating.  (Tr. 1483, 730.)  He was "dribbling" and "getting irritated because he was sore from standing."  (Tr. 731.)  Mr. Blake testified that he was not sure whether this difficulty was due to the pain in his legs or some other issue.  (Tr. 2084.)

The following morning, June 29, 2006, Mrs. Blake drove Mr. Blake to the Resource Center in Dunkirk, New York for his appointment with Dr. Jamal.  (See Exhibit K, pp. 814-816.)  Although Mr. Blake used a wheelchair to enter the clinic, he was able to walk into the examination room (Tr. 1483-85), where Dr. Jamal conducted a physical examination and took his medical history.  (Exhibits M at 4431, K at 815.)  Mr. Blake testified that he told Dr. Jamal at the start of his examination about his difficulty urinating

the prior evening. (Tr. 1485.) The written records from the admitting nurse and Dr. Jamal note Mr. Blake's back pain, but neither notes any red flag symptom of CES. (Id.) In particular, there is no record of any complaint regarding urinary dysfunction from the June 29, 2006 visit. Dr. Jamal credibly testified[4] that it is his custom to ask patients with low back pain whether they are experiencing urinary dysfunction and to document any positive findings, but not negative findings. (Tr. 151.) He further testified that, although he considered CES as a potential diagnosis, he ruled it out due to the lack of red flag symptoms, including the absence of urinary dysfunction. (Tr. 141, 2220, 2262-63.) Dr. Jamal diagnosed Mr. Blake with chronic back pain, prescribed additional pain medication, and ordered a urine toxicology test in conjunction with that prescription. (Exhibit K at 816.) Mr. Blake successfully provided the requested urine sample. (Tr. 2087.)

Although this court is confident that Mr. Blake testified in good faith that he reported his difficulty urinating to Dr. Jamal, it finds that his memory is less than clear with respect to the relevant events, and therefore does not fully credit his account. Mr. Blake first testified about the events of this case during his deposition seven years after his visit with Dr. Jamal. His testimony in Court was taken more than ten years after the visit. Although anyone might have difficulty remembering events after such a long period, Mr. Blake may be particularly susceptible to forgetfulness. Several of the prescription drugs that he has taken have been shown to lead to memory loss. (Tr. 879.) Further, Mrs. Blake testified that Mr. Blake's memory is not as good as it used to be. (Tr. 975.) Indeed, so much of Mr. Blake's testimony was inconsistent with the

---

[4] Dr. Jamal testified that he has no independent recollection of the visit with Mr. Blake. (Tr. 734, 47.) However, the notes recorded by Dr. Jamal on the date of the visit support Dr. Jamal's credible testimony that he followed his usual custom and practice in this case. (Tr. 2208.)

contemporaneous records of June 29, 2006 that it almost seemed that Mr. Blake was describing a different encounter. For example, Mr. Blake initially testified that he had seen Dr. Jamal several times prior to the June 29 visit, which was, in fact, his first time seeing Dr. Jamal. (Tr. 2085, 2099.) Mr. Blake also testified that he had not signed a pain management contract during the visit, but later admitted that he was mistaken after seeing the contract with his signature on it. (Tr. 2088.) Accordingly, and as explained in greater detail below, this Court finds that Mr. Blake did not report any urinary dysfunction to Dr. Jamal or the staff at the Resource Center on June 29, 2006.

On June 30, 2006, Mr. Blake's pain had increased again. Mrs. Blake brought him to the VA Hospital in Buffalo, where he was seen by Nurse Veronica Fagley and Dr. Rabie Stephan. The records indicate that Mr. Blake complained of severe low back pain that radiated down both legs and intermittent numbness. (Exhibit K at 812-13.) Although Mrs. Blake testified that she brought Mr. Blake into the hospital in a wheelchair, the records indicate that he was "ambulatory." (Id.) Mr. Blake testified that he told both Nurse Fagley and Dr. Stephan that he was having trouble urinating.[5] (Tr. 1489.) The written records from this visit again contain no documentation of CES red flag symptoms. (Exhibit K at 812.) Further, Dr. Stephan recorded that Mr. Blake denied any bladder or bowel dysfunction. (Id. at 1010.) Dr. Stephan testified[6] that, after taking a history and conducting a physical exam, and given the denial of bladder and bowel dysfunction and a finding of no sensory or motor loss, he ruled out CES as a possible diagnosis because there were no red flag symptoms. (Tr. 318.) Dr. Stephan ultimately

---

[5] He separately testified that he did not recall whether he had told Dr. Stephan about his difficulty urinating. (Tr. 1502.)
[6] Like Dr. Jamal, Dr. Stephan has no independent recollection of treating Mr. Blake and therefore relied on his written notes together with his custom and practice during his testimony. (Tr. 284-85.)

diagnosed Mr. Blake with acute and chronic back pain, an acute myofascial strain, and degenerative disc disease, and administered Dilaudid to ease Mr. Blake's pain. (Exhibit K at 1011, 814.)

Again, although this Court is confident that Mr. Blake testified in good faith and gave his best recollection of the visit on June 30, 2006, greater credit must be accorded to the contemporaneous medical records, which record that Mr. Blake did not have bladder dysfunction or any other red flag symptom of CES, and to Dr. Stephan's credible testimony as to his custom and practice. Accordingly, this Court finds that Mr. Blake did not report any urinary dysfunction or other red flag symptom to Dr. Stephan or the staff at the VA Hospital on June 30, 2006.

Mr. Blake fell asleep around 10 pm on the evening of June 30, 2006 and did not wake until 3 pm the following day, July 1, 2006.[7] (Tr. 1494-95.) When he attempted to get out of bed, he realized he could not feel his legs and he urinated on himself. (Tr. 1495.) Mrs. Blake estimated that Mr. Blake voided approximately 500-600 milliliters of urine. (Tr. 755-56.) Mr. Blake called the VA emergency line at 4:16 pm that afternoon and spoke to Nurse Kline, a registered nurse. He described his symptoms to her, including the loss of bladder control and the loss of feeling in his legs, both of which Nurse Kline recorded as "new" symptoms. (Exhibit K at 810.) Nurse Kline asked Mr. Blake a series of questions prompted by "TelCare," a program that uses an algorithm to make recommendations for medical care, and instructed Mr. Blake to proceed urgently to the VA Hospital emergency room. (Id.)

---

[7] There was some discussion at trial as to whether the medications administered by Dr. Stephan could have caused Mr. Blake to sleep for an extended period. This Court finds, based on Dr. Douglas Moreland's credible expert testimony, that the Dilaudid and Valium administered and prescribed by Dr. Stephan would not have caused Mr. Blake to sleep for an extended period, whether alone or in combination with Mr. Blake's other medications. (Tr. 2498-99.)

Mr. Blake checked into the VA Hospital at 5:56 pm on July 1, 2006. (Id. at 805.) The emergency room triage note indicates that he arrived in a wheelchair with "new" urinary incontinence. (Id. at 806.) Mr. Blake was treated first by Dr. O'Brien, then by Dr. Hobika after the shift changed at midnight. Dr. O'Brien recorded Mr. Blake's chief complaints to be back pain and incontinence. (Id. at 1008.) Dr. Hobika, when he took over Mr. Blake's care, recorded that Mr. Blake stated he "awoke 7/1/2006 in the morning with urinary incontinence, bilateral lower extremity burning dysesthesias, and significant right lower extremity weakness (unable to walk or get up from a chair) all new symptoms." (Id. at 803-804.) At 9:02 pm, the VA nurses allowed Mr. Blake to use a urinal and used a catheter to drain what remained in Mr. Blake's bladder; he voided a total of 1100 milliliters of urine. (Id. at 807, 1009.)

Dr. O'Brien ordered a number of tests, as well as an x-ray, in an attempt to rule out potential causes for Mr. Blake's symptoms. (Id. at 1009.) An MRI was not available at the VA Hospital during the weekend, so Dr. O'Brien ordered a CT scan instead. (Id.) There was a delay in obtaining Mr. Blake's CT scan because of his severe back pain and inability to lie flat for the exam. (Tr. 453.) After additional pain medication, a "heart-to-heart" talk from Dr. Hobika, and with pillows taped into place to support his knees, Mr. Blake was finally able to lie flat for the CT scan at 1:30 am on July 2, 2006. (Exhibit K at 808.) Once the images were evaluated, Mr. Blake was diagnosed with CES and transferred to Millard Fillmore Gates Hospital ("MFGH") for surgery because the VA Hospital did not have a neurosurgeon on call. (Tr. 533-34.) Mr. Blake arrived at MFGH at 6:05 am on Sunday July 2, 2006, and was in surgery with Dr. James Budny at 10:45 am that day. (Exhibit L at 1815.) The surgery was complete at 1:15 pm on July 2, 2006

(id.), less than 24 hours after Mr. Blake first contacted the VA Hospital emergency room line.

### 4. Mr. Blake's Continuing Symptoms

Since his CES surgery, Mr. Blake has been primarily confined to a wheelchair. (Tr. 1472.)  He is able to walk with "euro canes" that grip his arms, but only for short distances.  (Tr. 700-701.)  Mr. Blake cannot control his bladder or bowels, and so must follow a strict regimen and receive assistance from his wife to avoid soiling himself.  (Tr. 832-33, 1476.)  He takes morphine, but still suffers significant pain.  (Tr. 717-718, 840.)  Mr. Blake has also suffered from depression since the surgery.  (Tr. 714, 1477.)[8]

## B.  Expert Testimony

Plaintiffs presented nine expert witnesses, three of whom gave opinions that Mr. Blake's doctors breached the standard of care applicable in this case:  Dr. Budny, the neurosurgeon who operated on Mr. Blake at MFGH on July 2, 2006 and provided follow-up care thereafter; Dr. Finley Brown, who was offered as an expert in family medicine; and Dr. Justin Willer, who was offered by plaintiffs as an expert in neurology. Plaintiffs' other experts offered opinions on urology (Dr. Jerry Weinberg), radiology (Dr. Douglas Gibson), life care planning (Paul Lukasik), physiatry (Dr. Matthew Shatzer), psychiatry (Dr. Brian Joseph), and economics (Dr. Michael Vernarelli).  This Court credits the opinion of Dr. Budny because he was intimately acquainted with the facts of the case as a treating physician and because he practices in Western New York and is therefore familiar with the standard of care applicable here.  This Court gives less

---

[8] At trial, defense counsel appeared to question the extent of Mr. Blake's injuries, examining Plaintiffs at length regarding Mr. Blake's prior disabilities and downplaying his current impairments.  Although this Court has not found any liability on the part of Defendants, it nevertheless finds that CES has had a profound negative impact on Mr. Blake's quality of life.

credility to the opinions of Drs. Brown and Willer.[9]

As to Dr. Brown, in addition to the fact that he has never practiced in Western New York and was unable to provide a succinct or coherent definition as to standard of care, he appeared woefully unfamiliar with the facts of this case. For example, Dr. Brown opined that Dr. Jamal had breached the standard of care while relying on the records and actions of Dr. Stephan, and admitted that he had failed to review some of Dr. Jamal's records in forming his opinion. (Tr. at 1079, 1126, 1144.) Further, when asked about the signs and symptoms that a doctor should look for when diagnosing CES, Dr. Brown stated:

> A worsening of the pain, new pain, back pain with radiation down the extremities, numbness, tingling, paraesthesias, some change neurologically, in combination with *possible urinary issues*, bladder issues, hesitancy in urination and change in bowel function, including difficulty having bowel movement, rectal incontinence or both.

(Tr. 1057 (emphasis added).) This answer appears to be in contradiction with other experts in this case, who listed urinary issues to be a defining red flag symptom of CES. (See Tr. 796 (Budny: signs and symptoms of CES are "radicular symptoms, nerve root symptoms, weakness in the lower extremities, bowel and [bladder] dysfunction, sexual dysfunction, saddle anesthesia"), Tr. 2454-55 (Moreland: red flag symptoms of CES are "loss of bowel and bladder control and significant motor weakness in the lower

---

[9] The Government argues that the testimony of Plaintiffs' experts should be disregarded in whole or in part because Plaintiffs failed to make proper notice of their claims and because the testimony went beyond the expert disclosures. This argument rests on the experts repeated referrals to a June 20, 2006 VA compensation and pension exam that was not addressed in Plaintiffs' initial claim or in the experts' reports. (Exhibit N at 5912-13.) This Court need not reach these arguments because, as explained further below, it finds the June 20, 2006 VA compensation and pension exam to be largely irrelevant. The Government also argues that testimony outside the experts' respective areas of expertise should be disregarded. This Court finds that this argument goes to weight and relevance, not admissibility. Accordingly, minimal credit is given to the testimony of Dr. Gibson, a radiologist, and Dr. Weinberg, a urologist, because none of the medical professionals alleged to have committed malpractice are in these fields, and because this Court found their testimony to be less than credible. However, none of the testimony will be stricken from the record.

extremities, meaning inability to ambulate or bear weight").) <u>See also</u> <u>Jimerson</u>, 2003 WL 251950, at *2 ("bladder dysfunction is the 'hallmark' symptom of CES"). Dr. Brown appeared to show bias in favor of Plaintiffs, stating with respect to a statement by Mrs. Blake: "Whatever she said, I would believe." (Tr. 1163.) Perhaps most troubling, Dr. Brown opined that Dr. Hobika's actions might have met the standard of care "if [his treatment] ended with the proper outcome." (Tr. 1094.) <u>See</u> <u>Kasper v. Damian</u>, 689 F. Supp. 2d 492, 499 (W.D.N.Y. 2010) (doctor's treatment "is not actionable merely because it turns out to be wrong in hindsight"). These types of errors and inconsistencies, together with Dr. Brown's somewhat cavalier and unprepared demeanor during testimony, contribute to this Court's decision to give limited credit to his opinion.[10] <u>See generally</u> <u>Krynski v. Chase</u>, No. 06CIV4766AMDVMS, 2016 WL 1029498, at *4 (E.D.N.Y. Mar. 8, 2016) (finding experts' testimony not credible where "it would take pages to catalog every instance of bias, speculation, evasion, and sheer absurdity that characterized their testimony"), aff'd, No. 16-1090, 2017 WL 658716 (2d Cir. Feb. 17, 2017).

Similarly, Dr. Willer showed a distressing lack of knowledge of even the basic facts of the case. For example, Dr. Willer did not know where Dunkirk, New York is located (Tr. 2120), could not recall how Mr. Blake injured his back (Tr. 2120-21), believed that the relevant events took place in 2011 (Tr. 2122), did not know what tests Dr. Jamal performed during his examination (Tr. 2136-38), was not aware that Dr. Jamal had treated Mr. Blake only once (Tr. 2133), and could not recall the name of Mr. Blake's neurosurgeon (Tr. 2116). While any single such failure may have been

---

[10] However, this Court declines to apply the *falsus in uno, falsus in omnibus* doctrine to Dr. Brown's testimony as urged by Defendants. <u>See</u> <u>Parraga v. Holder</u>, 548 Fed. App'x. 684, 685 (2d Cir. 2013).

innocuous, the weight of these lapses together is sufficient to call into doubt Dr. Willer's ability to opine as to whether any of the medical professionals involved in this case deviated from the standard of care.[11]  Dr. Willer also betrayed a bias against doctors generally.  (Tr. 2132: "I assume most [doctors] aren't going to do their jobs, so I double-check when I get a patient, everything they're supposed to have done.")

Defendants called two experts:  Dr. Edward Stehlik, Dr. Jamal's expert witness in family medicine, and Dr. Douglas Moreland, the Government's expert witness in the field of neurosurgery.  This Court credits the testimony of both Drs. Stehlik and Moreland.  First, like Dr. Budny, Drs. Stehlik and Moreland both practice in Buffalo and were able to clearly set forth the standard of care applicable to Western New York. Second, both of the defense experts demonstrated strong familiarity with the facts of the case.  Finally, as described further below, Drs. Stehlik and Moreland based their opinions on Mr. Blake's contemporaneous medical records, which Plaintiffs' experts effectively disregarded.

## C.    Standard of Care

This Court must, at the threshold, determine the applicable standard of care in this case and whether the medical professionals who saw Mr. Blake during the relevant period deviated from that standard of care.  The general standard of care requires a physician to "exercise that reasonable degree of learning and skill that is ordinarily possessed by physicians . . . in the locality where he practices."  Perez, 85 F. Supp. 2d at 226.  Both sides positively cite the standard of care set forth in Jimerson, an FTCA

---

[11] Dr. Willer was also oddly evasive in his testimony, refusing to answer seemingly benign questions on cross-examination unless he had a document in front of him (see Tr. 2121-24), and stating that he could not recall when he last saw a patient in a hospital, whether he saw more than one patient in 2016, or the titles of any of his published articles (Tr. 2119, 1312).

medical malpractice case in this District that also involved injuries arising from CES.[12]
2003 WL 251950, at *3. In that case, the court found that the doctor involved, who
failed to diagnose plaintiff with CES, did not breach the standard of care applicable in
Western New York because the plaintiff reported that he had urinated without incident a
few hours prior to his visit. Id. at *4 ("Dr. Iqbal did not deviate from the applicable
standard of care by diagnosing nerve root compression rather than CES because
[plaintiff] had not manifested . . . bladder dysfunction—the hallmark symptom of CES").

This Court rejects the standard urged by some of Plaintiffs' experts, which goes
far beyond that of Jimerson. Dr. Brown opined that the standard of care would have
required Mr. Blake's doctors to conduct additional and invasive examinations, such as a
rectal exam, or send Mr. Blake immediately to the emergency room, even where no red
flag symptoms were present. (Tr. 1087-89.) Dr. Willer proposed a similar standard,
stating that, as soon as Mr. Blake's reported exacerbated pain, "given his history, he
should have gotten urgent neurologic and neurosurgical consultation." (Tr. 1351.) As
noted above, the symptoms that Mr. Blake reported on June 29 and 30, 2006 were
essentially the same as those he reported at dozens of medical visits in the decades
before this incident. (Tr. 2467.) This Court does not find it credible that every flare up
of low back pain requires invasive examinations or emergency care where no red flags
symptoms are present. Such standards go beyond the "reasonable care" required in
New York. See Perez, 85 F. Supp. 2d at 226.

The credible expert witnesses, including one of Plaintiff's experts, agreed that the

---

[12] The court in Jimerson found in favor of defendants. This Court finds that the plaintiff's position in
Jimerson was in fact more persuasive than that set forth here, as it is undisputed Mr. Jimerson informed
his doctor that he was only able to urinate "a little bit like trickle out" and that he had collapsed prior to his
visit and came in a wheelchair. 2003 WL 251950, at *3. The court in Jimerson held that plaintiff's ability
to manage only a trickle after his fall did not "indicate bladder dysfunction" consistent with CES. Id. at 4.

standard of care requires medical professionals be able to recognize the red flag symptoms of CES—bladder dysfunction, saddle anesthesia, and loss of motor function—and, when these red flags are present, take the necessary steps to confirm or rule out CES as soon as possible. (Tr. 2461 (Moreland); 852 (Budny); 2337-45 (Stehlik).) As Dr. Budny said, if CES is ruled out, the physician has "the luxury of time to deal with the problem." (Tr. 777.) If CES is diagnosed, the standard of care requires that surgery be performed as soon as possible, though the credible expert opinions agree that surgery within 24 hours meets the standard of care.[13] (Tr. 2532.)

1. Bladder Dysfunction

As noted above, Mr. Blake testified that he experienced difficulty urinating on June 28, 2006 and informed his doctors and nurses. In order to credit this testimony, this Court would need to disregard numerous contemporaneous medical records, the credible testimony of the doctors who treated Mr. Blake, and the medical evidence agreed on by the experts.

First, it would be necessary to disregard the written records of the two doctors and two nurses who saw Mr. Blake on June 29 and 30, none of whom recorded a complaint of trouble urinating, and one of whom specifically recorded that Mr. Blake denied any form of urinary or bowel dysfunction. (Exhibits M at 4431 and K at 815-16 (Dr. Jamal and Nurse Draves' notes from June 29); Exhibit K at 811-13 (Nurse Fagley's note from June 30, 2006); Exhibit K at 1010-11 (Dr. Stephan's note from June 30, 2006).) Further, this Court would have to disregard the medical records from July 1, 2006, all of which record that Mr. Blake's urinary symptoms and loss of feeling in his

---

[13] Jimerson found that the standard of care required surgery within 48 hours after diagnosis. 2003 WL 251950, at *5 n.16 (doctor satisfied the applicable standard of care for Western New York where he ordered an MRI within 24 hours and surgery took place within 36 hours).

legs were "new" symptoms. (Exhibit K at 809-10 (Nurse Kline's note); Exhibit K at 806 (triage note from VA emergency room); Exhibit K at 108-09 (Drs. O'Brien and Hobika's notes).) Even Dr. Budny's records from July 2, 2006 state that Mr. Blake's symptoms began "24 hours ago" and that Mr. Blake was "incontinent for 24 hours." (Exhibit L at 1762, 1811.) The sole record indicating that Mr. Blake experienced urinary symptoms prior to July 1, 2006 is a urological consult performed by Dr. Joseph Ciccone on July 5, 2006, which states that Mr. Blake's urinary symptoms began "approximately two weeks prior to admission." (Exhibit L at 1767.) However, this record has numerous other inconsistencies: it also states that Mr. Blake was admitted "two weeks" ago (he was admitted three days prior to the record), that Mr. Blake had microscopic hematuria, and that his CES was fracture-induced. (Id.) None of these statements are correct. Plaintiffs also point to the June 20, 2006 VA compensation and pension exam in support of their argument that Mr. Blake's symptoms, and particularly his bladder dysfunction, began around this time. (Exhibit N at 5912-13.) Indeed, Dr. Brown opined that Mr. Blake's urinary dysfunction began on June 20 because he complained of nocturia, or frequent urination during the night. (Tr. 1096-97.) However, the credible expert evidence suggests that nocturia is a common symptom—like back pain—that is not a red flag of CES and is likely entirely unrelated to Mr. Blake's later diagnosis. (Tr. 2455-57 (Moreland: nocturia is "so common in the adult male population, particularly in Mr. Blake's age group, that it is of no clinical significance").)

In sum, in order to credit Mr. Blake's testimony that he correctly informed his caregivers that he began experiencing urinary dysfunction on June 28, 2006—or before, as urged by Plaintiffs—this Court must find that two nurses and one doctor entirely

ignored his complaint, and every other doctor and nurse, except one, misreported his statement.  See Kawache v. United States, No. 08-CV-3128 KAM SMG, 2011 WL 441684, at *9 (E.D.N.Y. Feb. 7, 2011) (crediting contemporaneous medical records over witness testimony in medical malpractice case where records were consistent with doctor's custom and practice and there was reason to doubt the credibility of the witness).

Second, it would be necessary to disregard the testimony of Dr. Jamal, who credibly testified that his custom and practice is to ask patients with complaints of back pain whether they are experiencing any bladder or bowel issues and document the findings if they are positive.  (Tr. 151.)  It would similarly be necessary to disregard the testimony of Dr. Stephan, who also credibly testified that he asked Mr. Blake if he was experiencing any bladder dysfunction.  (Tr. 288.)  Dr. Stephan's testimony is further supported by his contemporaneous notes, in which he recorded that Mr. Blake was not having any bladder dysfunction or frequent urination.  (Exhibit K at 1010-11.)

Third, it would be necessary to disregard the credible testimony by experts from both sides regarding Mr. Blake's urinary symptoms.  CES causes urinary retention, meaning that the patient is no longer able to urinate.  Because the bladder is only able to hold a certain amount, retention will eventually lead to incontinence once the bladder reaches its threshold and urine spills out.  Neither Plaintiff can recall when Mr. Blake successfully last voided his bladder prior to becoming incontinent on July 1, 2006, but the evidence suggests that he did not go into urinary retention until the evening of June 30, 2006.  Assuming that Mrs. Blake's estimate is correct, and that Mr. Blake voided 500-600 milliliters when he was incontinent on the afternoon of July 1, and adding the

1100 milliliters drained from Mr. Blake's bladder at the hospital, he had created between 1600 and 1700 milliliters of urine total by 9 pm on July 1. The medical experts who testified on this point agreed that an average adult male creates 50-100 milliliters of urine every hour, amounting to 1200 to 2400 milliliters every 24 hours. (Tr. 2518, 437, 1249.) Assuming that Mr. Blake fell into the middle of this range, producing 75 milliliters per hour (which is unlikely, as he is a diabetic and therefore prone to create more urine than the average adult, Tr. 2518), it would have taken less than 24 hours to create 1700 milliliters of urine. This suggests that Mr. Blake went into urinary retention no later than the evening of June 30, 2006.[14]

This is consistent with Dr. Stephan's records and testimony, which indicate that he palpated Mr. Blake's abdomen during Mr. Blake's visit around 4 pm on June 30, 2006 and found nothing unusual. (Tr. 309.) If Mr. Blake had already been retaining a significant amount of urine by the afternoon of June 30, Dr. Stephan would have felt a distended bladder when he palpated Mr. Blake's abdomen. It is also consistent with the fact that Mr. Blake was able to give a urine sample on June 29, 2006. (Tr. 2087.) Mrs. Blake's testimony that Mr. Blake made several trips to the bathroom during the night of June 29, 2006 further suggests that he was not experiencing urinary retention at that time. (Tr. 739 (noting that Mrs. Blake was not sure whether Mr. Blake was successful in voiding his bladder).)

2. Saddle Anasthesia

The second red flag symptom of CES is saddle anesthesia, characterized by numbness around the genitals and anus. Mr. Blake does not allege that he experienced

---

[14] Even if Mr. Blake fell into the bottom of the range, producing only 50 milliliters of urine per hour, his retention still would have begun no later than 11 am on June 30, 2006, well after the time at which he claims to have first experienced difficulty urinating, on June 28, 2006.

saddle anesthesia until July 1, 2006. He reported numbness in one of his legs on June 29, 2006 (Exhibit K at 815) and intermittent numbness of the legs on June 30, 2006 (Id. at 812-13), but these symptoms are consistent with his prior medical complaints and not a red flag for CES.

### 3. Loss of Motor Function

The third red flag symptom of CES is loss of motor function, generally resulting in the inability to walk. Mr. and Mrs. Blake credibly testified that Mr. Blake had severe difficulty ambulating after he injured himself painting patio furniture during the weekend of June 24-25, 2006. Mrs. Blake also testified that, although she brought Mr. Blake into the Resource Center in a wheelchair, he was able to walk from the hallway into Dr. Jamal's office for his examination, and able walk into the bathroom by himself to provide a urine sample. (Tr. 1483-85) She further testified that Mr. Blake was able to walk around their house with a walker on June 29, 2006. (Tr. 739.) The records from June 30, 2006 indicate that Mr. Blake was able to walk into the VA emergency room. (Exhibit K at 812.) Mr. and Mrs. Blake dispute this. (Tr. 745, 1490-91.) They also state that they told Dr. Stephan that Mr. Blake's legs felt "rubbery." (Tr. 744.) There is, however, no dispute that Mr. Blake told Nurse Kline on July 1, 2006 that he was unable to feel his legs and was unable to walk, which she recorded as "new" symptoms. (Exhibit K. at 810.)

Just as with the urinary symptoms, this Court gives more credit to the contemporaneous medical records than to testimony of events that took place more than ten years ago. Because the records indicate that Mr. Blake was able to walk into his appointment with Drs. Jamal and Stephan and describe normal motor function, but

do not note "rubbery" legs, this Court finds that Mr. Blake did not report or exhibit motor function loss until July 1, 2006.

## IV.    PENDING MOTIONS

Plaintiffs, Dr. Jamal, and the Resource Center have moved for judgment on partial findings.  The Government has moved for judgment as a matter of law.  "When issuing a judgment on partial findings the trial judge is not required to draw any special inferences in favor of the non-moving party.  A trial judge must evaluate and weigh all the evidence, make determinations regarding credibility, and resolve the case on the basis of the preponderance of the evidence."  Christoforou v. Cadman Plaza N., Inc., No. 04 CV 08403 (KMW), 2009 WL 723003, at *10 (S.D.N.Y. Mar. 19, 2009).

### A.    Plaintiffs' Motion for Judgment on Partial Findings

Plaintiffs move for a judgment on partial findings on three bases.

First, they argue that Dr. Jamal committed malpractice by failing to note or failing to ask Mr. Blake whether he was suffering from any urinary dysfunction.  Plaintiffs contend that there is no evidence that Dr. Jamal inquired as to bladder function because he does not have any independent recollection of the visit with Mr. Blake and his testimony as to custom and practice is inadmissible.  This argument relies on the tense of the verb that Dr. Jamal used when discussing his custom and practice in 2006.  Dr. Jamal testified:  "It's my custom and practice to ask about these symptoms, document them, if positive, to back up documentation."  (Tr. 151.)  This answer was given in response to a question regarding Dr. Jamal's treatment of Mr. Blake, and therefore appears to be applicable to his custom and practice during the relevant events.  Further,

Dr. Jamal, though highly fluent in English, is not a native speaker.[15]  Any shift in tense may therefore be attributed to either a lack of fluency or simply a trip of the tongue.  The remainder of Dr. Jamal's testimony makes clear that he referred to his custom and practice at the time of his treatment of Mr. Blake, in 2006.  (Tr. 2212.)  Further, this Court does not credit Mr. Blake's testimony that he told Dr. Jamal he was experiencing urinary dysfunction.  As to admissibility, Plaintiffs waived any objection to Dr. Jamal's testimony as to his usual practices by failing to object at trial and eliciting the testimony at issue from Dr. Jamal.  Though they cannot now argue that it should not be admitted, this Court has construed their argument as one relating to the weight owed to the evidence.  As discussed above, because Dr. Jamal's testimony was consistent with the medical records and other evidence, this Court finds his testimony as to custom and practice to be credible.

Second, Plaintiffs contend that Dr. Stephan committed medical malpractice by referring again to what may have been a lack of fluency or trip of the tongue in Dr. Stephan's testimony.  Plaintiffs' counsel asked Dr. Stephan to name all the potential causes for back pain that he included in his dynamic assessment of Mr. Blake, referred to as a "differential diagnosis."  Dr. Stephan named several potential causes for Mr. Blake's pain, including CES, that he considered over the course of the visit.  Counsel then asked:  "Did you convey to the patient that CES was in—was still in your differential diagnosis?"  (Tr. 323.)  To which Dr. Stephan responded:  "No, I did not.  I conveyed to the patient what I think is wrong with him, which is what I have stated before."  (Id.)  This argument appears to twist Dr. Stephan's words and the meaning of

_____

[15] For example, Dr. Jamal switched to future tense when talking about his actions in the past.  (Tr. 2202 (with respect to why he relocated from Lebanon, "[b]ecause coming to the United States will give me an opportunity").)

the term "differential diagnosis." Although, like Dr. Jamal, Dr. Stephan is not a native speaker of English, this Court finds that the testimony, read in context, cannot be understood as a statement that Dr. Stephan continued to consider CES as a possible diagnosis at the end of his visit. He considered it an unlikely possibility initially, and ruled it out due to the absence of red flag symptoms. (Tr. 318.) The remainder of Dr. Stephan's testimony makes clear that CES was eliminated from his differential diagnosis based on Mr. Blake's physical exam and medical history. (Tr. 317-18, 320.) Dr. Stephan's testimony is also supported by his contemporaneous records, in which Dr. Stephan noted the absence of CES red flag symptoms and made a diagnosis of acute and chronic back pain, an acute myofascial strain, and degenerative disc disease.[16] (Exhibit K at 1010-11.)

Third, Plaintiffs contend that Nurse Kline, the VA emergency room nurse who took Mr. Blake's call on July 1, 2006, should have over-ridden the recommendation of the TelCare program and instructed Mr. Blake to proceed immediately to a hospital with neurosurgical capacity. In making this argument, Plaintiffs rely on the testimony of their expert Dr. Brown, who opined that Nurse Kline breached the standard of care by failing to diagnose Mr. Blake with CES over the phone. (Tr. 1090-91.) As set forth above, this Court did not find Dr. Brown's testimony to be credible. Further, this Court has found

---

[16] There was a dispute between the experts as to whether CES is solely an acute condition or whether it can also occur progressively. The Government's expert, Dr. Moreland, testified that CES arises when there "is an acute injury to the nerves in the lower spinal canal, [the] cauda equina, which results in the red flags being loss of bladder control, bowel control and significant weakness of the lower extremities." (Tr. 2451.) Several other experts, as well as Dr. Jamal, Nurse Kline, and Dr. O'Brien, testified that CES may be acute or progressive. (Tr. 783-785 (Budny); 1057, 1063 (Brown); 63, 68-69, 74, 76 (Jamal); 352 (Kline); 398-399, 404-405(O'Brien).) This Court need not make a factual finding as to whether Mr. Blake suffered from a progressive form of CES, and thus whether a diagnosis of CES would have been correct on either June 29 or 30, 2006, because it has found that Mr. Blake did not report or exhibit red flag symptoms to his caregivers. An incorrect diagnosis, in and of itself, does not breach the standard of care. See Nestorowich, 97 N.Y.2d at 398.

that there is no breach in the standard of care where surgery occurs within 24 hours of diagnosis. Thus, even if it were proper for Nurse Kline to have diagnosed Mr. Blake over the phone—which this Court strongly doubts—there was no breach of the standard of care because Nurse Kline directed Mr. Blake to the VA Hospital emergency room, where he was diagnosed, transferred, and ultimately operated on well within the 24 hour window.

## B. Defendants' Motions

Defendants move for judgment on the grounds that Plaintiffs failed to prove that Mr. Blake's caregivers breached the standard of care and failed to prove that Defendants actions were the proximate cause of Mr. Blake's injuries.

Plaintiffs' evidence of breach relies on their expert witnesses' opinions. However, in reaching their opinions, Plaintiffs' experts either set forth an overly broad standard of care, as described above, or relied on statements by Plaintiffs that Mr. Blake began experiencing urinary dysfunction on June 28, 2006 and that Mr. Blake informed his medical providers of his symptoms. (Tr. 904 (Budny), 1083, 1096 (Brown), 1337, 1351 (Willer).) This Court has found that (1) Mr. Blake did not inform his doctors that he was experiencing bladder dysfunction until July 1, 2006 and did not begin experiencing urinary retention until the evening of June 30, 2006 at the earliest; (2) Mr. Blake did not experience saddle anesthesia until July 1, 2006; (3) Mr. Blake was ambulatory until July 1, 2006. Accordingly, because Mr. Blake did not report or exhibit the three red flag symptoms associated with CES on June 29, 2016, Dr. Jamal did not breach the standard of care by ruling out CES during his visit. Further, Dr. Jamal's decision to treat Mr. Blake's reported pain fell within the appropriate standard of care.

Accordingly, Dr. Jamal and the Resource Center's Motions for Judgment on Partial Findings are granted. Because this Court has found that Dr. Jamal did not breach the standard of care, it does not reach Dr. Jamal and the Resource Center's arguments as to proximate cause.

The Government's motion is also granted. This Court has found that Mr. Blake did not present with the symptoms of CES until the afternoon of July 1, 2006. Dr. Stephan, who treated Mr. Blake on June 30, 2006, again before any red flag symptoms arose, did not breach the standard of care by ruling out CES, nor did he breach the standard of care by treating Mr. Blake's pain. This Court has also found that the standard of care is met when a patient suffering from CES is operated on within 24 hours. The Government was first alerted to Mr. Blake's red flag symptoms at 4:16 pm on July 1, 2006, when Mr. Blake spoke to Nurse Kline by phone, and his surgery was complete at 1:45 pm on July 2, 2006. Nurse Kline, Dr. O'Brien, and Dr. Hobika were therefore well within the standard of care for treating CES in a timely manner.

Accordingly, this Court concludes that Plaintiffs have failed to prove by a preponderance of the evidence that any Defendant or its agent breached the standard of care during Mr. Blake's visits to the Resource Center and the VA Hospital on June 29, 2006 through July 2, 2006. Having found that Plaintiffs failed to prove medical malpractice by a preponderance of the evidence, Mrs. Blake's loss of consortium claim is also dismissed.

## C.    Defendants' Motions to Strike

Pursuant to the Pre-Trial Order in this case, the parties were ordered to submit their proposed findings of fact and conclusions of law together with a tabbed binder,

where each tab contained one proposed finding of fact, a record citation, and a copy of the transcript page or piece of evidence relied upon.  (Docket No. 101.)  Because only the Government complied with this Order in its initial submission, this Court requested that the parties re-file their findings of fact and conclusions of law in the proper format.  (Docket No. 196.)  Plaintiffs, in attempting to comply, made numerous changes to their filing.  (Compare Docket No. 190, Docket Nos. 201, 202.)  Defendants moved to strike Plaintiffs' filing in its entirety, arguing that Plaintiffs had used the additional time granted by this Court for re-filing to make substantive changes to the documents.  Plaintiffs opposed, arguing that any changes from their initial filings were purely stylistic and made for formatting reasons.  This Court denied the motions to strike without prejudice, noting that "to the extent that any proposed finding of fact or conclusion of law was not included in Plaintiffs' original filing, Defendants may move to have that specific paragraph struck."  (Docket No. 211.)

Defendants have now renewed the motions to strike, seeking again to have the entire submission stricken or, in the alternative, that a limited number of paragraphs be stricken.   Defendants argue that, due to the wholesale revisions in Plaintiffs' submissions, it is not simple to identify all the changes that were made.  They further argue that the "subtle changes" impact the entire document to Defendants' detriment.  This Court has reviewed the specific changes identified by Defendants, as well as reviewing the revised submissions as a whole.   Plaintiffs' revisions, though unquestionably improper, are ultimately irrelevant.  The added and revised facts do not impact this Court's judgment that Plaintiffs failed to prove their case by a preponderance of the evidence.

Accordingly, the motions to strike are denied.

## V.    CONCLUSION

This Court finds that Defendants and their agents satisfied all applicable standards of care in the diagnosis and treatment of Mr. Blake.  Based upon these Findings of Fact and Conclusions of Law, Plaintiffs' claims against Defendants are dismissed.  Plaintiff's Rule 52 motion is denied.  Defendants' Rule 50 and Rule 52 motions are granted.  Defendants' motions to strike are denied.

## VI.    ORDERS

IT HEREBY IS ORDERED that Plaintiffs' Motion for Judgment on Partial Findings (Docket No. 194) is DENIED;

FURTHER, that Defendant Dr. Nabil Jamal's Motion for Judgment on Partial Findings (Docket No. 195) is GRANTED;

FURTHER, that Defendant NYSARC INC. Chautauqua County d/b/a the Resource Center's Motion for Judgment on Partial Findings (Docket No. 189) is GRANTED;

FURTHER, that Defendant the United States' Motion for Judgment as a Matter of Law (Docket No. 187) is GRANTED;

FURTHER, that Defendants' Motions to Strike (Docket Nos. 217, 218, 219) are DENIED;

FURTHER, that the Clerk of Court is directed to enter a Judgment in favor of Defendants, consistent with this Decision and Order, pursuant to Rules 52(a) and 58 of the Federal Rules of Civil Procedure;

FURTHER, that the Clerk of Court is directed to close this case.

SO ORDERED.


Dated: April 17, 2017
Buffalo, New York

<u>/s/William M. Skretny</u>
WILLIAM M. SKRETNY
United States District Judge